WOLFF and others v. THE VADERLAND, etc.

INTERNATIONAL NAV. CO. v. ONE THOUSAND SIX HUNDRED AND FIFTY-SEVEN RINGS OF GALVANIZED WIRE AND FOUR HUNDRED AND THIRTY-ONE RINGS OF STEEL WIRE RODS, etc.

WOLFF and others v. INTERNATIONAL NAV. CO.    (Two Cases.)

*(District Court, S. D. New York.    December 5, 1883.)*

1. SHIPPING—BILLS OF LADING—EXCEPTIONS—RUST—TELEGRAPH WIRE.
    Where the whole or parts of seven shipments of galvanized iron wire for telegraphic purposes, on board different steamers on the Red Star Line, from Antwerp to New York, were found damaged on arrival in three respects—*First*, crushing of the bundles; *second*, oxidation or corrosion of the zinc coating of the wire, forming a white powder; and, *third*, black damage, as if rolled through a black, pasty mass, and, the precise cause of the damage not appearing, *held*, the vessels were liable for the first and third items of damage. All the bills of lading having expressly excepted "*rust*," and on the last three shipments bills of lading containing a further written exception of liability for "rust or corrosion," *held*, that the oxidation of the zinc coating constituted "rust" within the exception of the bill of lading, and the libelants, not having proved any negligent acts on the part of the ship which caused the rust, *held*, that the ship was not liable for this item of damage.

2. SAME—GOOD FAITH—EVIDENCE.
    Good faith in the prosecution of claims forbids that vague or loose estimates of damage should be received where proper evidence has been voluntarily parted with by the suitor. Estimates may be received, however, where the proper evidence has been parted with through misapprehension as to the extent of the suitor's rights, though in such cases he should not recover beyond the lowest estimates of the most credible witnesses.

In Admiralty.

*Rodman & Adams* and *R. D. Benedict,* for Wolff, Kahn & Co.

*Edward S. Hubbe* and *John E. Parsons,* for steam-ship company.

BROWN, J.   The controversy upon which the above several libels were filed arose out of the importation by Wolff, Kahn & Co. of a large quantity of galvanized iron wire, designed to be used as telegraph wire, in the months of April and May, 1880, upon seven different steamers belonging to the International Navigation Company, and known as the Red Star Line, running from Antwerp to New York. The date of arrival of the several steamships, the aggregate bundles of wire brought, and the number alleged to be damaged in the shipments were as follows:

| Date of sailing. 1880. | Name of steamer. | Date of arrival. | Total bundles. | Admitted to be good. | Claimed to be damaged. |
|---|---|---|---|---|---|
| March 27 | Rhynland | April 9 | 519 | 246 | 273 |
| April 5 | Zeeland | " 20 | 691 | —— | 691 |
| " 10 | Hevelius | " 26 | 339 | —— | 339 |
| " 17 | Belgenland | " 30 | 939 | —— | 939 |
| May 1 | Nederland | May 14 | 1657 | 1255 | 402 |
| " 8 | Vaderland | " 22 | 807 | —— | 807 |
| " 15 | Zeeland | " 29 | 215 | —— | 215 |
| Total of damaged bundles, | | | | | 3666 |

The first libel filed May 28th, was for damage to the wire which arrived by the Vaderland on May 22d. On the following day the cross-libel second above named was filed, to recover a balance of freight due upon the various shipments; the two subsequent libels, filed on the twenty-fourth of August and twelfth of October, were to recover the damages upon the other shipments, amounting altogether to some $28,000. The amount of the freight unpaid, as alleged in the cross-libel, is not disputed. The controversy relates to the alleged damage to the wire, the amount and causes of it, and the question as to the liability of the steam-ship company therefor.

The evidence on the part of Wolff, Kahn & Co. shows three kinds of damage: (1) The crushing down of some of the coils upon their edges, so that the wire was bent; (2) the white damage, affecting all the damaged bundles, and consisting of the oxidation of the zinc covering of the wire; (3) the black damage, so called, as if the bundles had been rolled through some black, pasty mass.

1. As regards the first kind of damage, there is substantially no question that the carriers would be responsible for any actual injury arising from the bundles being crushed out of shape, unless they proved that it arose from perils of the sea or some of the causes excepted in the bills of lading. No satisfactory proof of that kind, however, has been offered by the carriers, as they claim that the damage from this cause was very trifling, and an afterthought not contemplated in any of the libels filed by Wolff, Kahn & Co. The averments of libel No. 3, which presents the claim upon most of the shipments are, in that respect, as follows: After alleging that the wire was shipped in good order, the libel avers that "the said the International Navigation Company has not yet delivered the said shipments, or either of them, to the libelants in good order, and well conditioned, nor did said company carry the same safely in or upon its said steam-ships, or any of them; on the contrary, said company, its agents and employes, stowed, handled, and carried said goods, and all of them, in a grossly careless and grossly negligent manner, and permitted them to come in contact with water, wine, acid, salt, saltpetre, filth, or other deleterious matter, whereby said goods and all of them were greatly damaged and partially lost to the libelants; that such damage and loss was not caused by any of the exceptions in the said bills of lading, or any of them, but from some cause which the said vessels and the said the International Navigation Company were bound in law to provide against, and that the damage and loss were, in the case of each shipment, more than the amount of freight therefor."

Under these allegations evidence was given of the various kinds of damage above referred to. The averments of stowing, handling, and carrying the goods in a grossly careless and negligent manner is *prima facie* sufficient to admit proof of injury by the crushing which, as it would seem, must have arisen in some one of the ways here in-

dicated. The evidence, however, as to the amount of damage through this cause, and as to the number of coils which were crushed, is unsatisfactory and uncertain to the last degree. Evidently very little stress was laid upon this item of damage at the time. The importers, though carefully picking out the coils damaged by the white oxidation, and keeping account of them, kept no account of those that were out of shape. The only evidence offered on the trial as to the number of bundles crushed was merely estimates, according to the recollection of different persons who had seen or handled the wire. Mr. Wolff estimated that from 15 to 20 per cent. of the damaged coils were crushed, and he is certain that there were over 100 bundles. Mr. Smith says he could not tell the number exactly, it might be between 400 and 600 coils, or about 10 per cent. of the damaged bundles. Mr. Shippy thinks that of the part which he examined about 10 per cent. of the damaged bundles were crushed, but that he could not give a very good idea. Lefferts says his estimate made at the time was 20 per cent.

On the other hand, Mr. Bates, who bought what was left of the wire after the best of it had been disposed of, and had it put up on telegraph poles, testifies that he did not notice the crushed wire particularly, as there was not enough of it to attract his attention. The wire was purchased by him, subject to damage from all causes, at a reduction of two cents a pound on the market price. The evidence of Wolff, Kahn & Co. was to the effect that the crushed wire could only be put into marketable condition by re-reeling at a cost of about one cent a pound. It does not appear that the damaged wire was re-reeled before being put up. It was purchased, however, as damaged wire, at a loss of two cents below the market price, and no evidence was given on the part of the steam-ship company to show that the damage from crushing could be repaired for less than a cent a pound. I think Wolff, Kahn & Co. are entitled to damages at that rate on the amount of wire proved to have been crushed. The difficulty is in determining from such evidence as the above what should be allowed for this item of damage.

How inexact and untrustworthy the above estimates are is obvious from other parts of the testimony. Mr. Smith, an employe of Roebling & Co., who, on Smith's report, rejected the wire, testifies, first, that "he handled every bundle of it," to pick the good from the bad; but afterwards he says that "some shipments I did not touch at all,—condemned the whole lot,—because I went over the tiers and looked down through it, and could see the marks (the black and white damage) all through the coils, and I told my employer there was no need of examining it." Now, five out of the seven shipments complained of were rejected *in toto*. It is probable, therefore, that Smith really picked over and handled only two of the seven shipments. No reliance can be placed, therefore, on his mere estimate of the number crushed. Mr. Shippy was superintendent of Roebling & Co., and

examined some of the wire after Mr. Smith's report. His estimate of 10 per cent. crushed had reference only to what was stored in Washington street, (about one-third of the whole;) his attention was not directed to the crushing of the rejected coils on the dock. Mr. Leffert's examination was not by handling the wire, but he "crawled all over the piles in order to form his estimate of the amount of damage." McIntosh, as superintendent of the Western Union Telegraph Company, was accustomed to import wire. He could not swear to any given number, but only to his estimate of 8 to 10 per cent., and that there were crushed bundles in every lot. From this kind of testimony it is manifest that nothing approaching a really accurate ascertainment of the number of crushed bundles can now be had.

The burden of proof to show the number of coils damaged by crushing is clearly upon the importer. And yet Wolff, Kahn & Co. notwithstanding the commencement and pendency of these suits, disposed of all the wire without keeping any account or record or trustworthy evidence of the number of crushed coils. Had the injury to the coils by crushing been intended at that time to be made a subject of claim for damages, separate and distinct from injury to the wire from other causes, the failure to keep any proper evidence of the amount of injury from crushing would have been inexcusable. The same general rule which requires parties to present in courts of justice the best evidence in their power, and makes every intendment against them when such evidence is withheld, applies in a measure to any voluntary loss of, or failure to keep, proper and appropriate evidence. Greenl. Ev. §§ 82–85; *Clifton* v. *U. S.* 4 How. (U. S.) 242, 247–248; *Blade* v. *Noland,* 12 Wend. 173. If the injury from crushing was intended at the outset to be made a separate ground of claim for damages, I should consider it the duty of the court to refuse to entertain this branch of the claim, based upon such untrustworthy estimates. Good faith in the prosecution of claims forbids that vague and loose estimates of damage should be received when no pains has been taken to preserve any appropriate evidence which was in the power of the party.

In this case, while I am satisfied on the one hand that there was no intention of neglecting to keep any proper evidence of the legal demand supposed to be necessary, I am equally satisfied that there was not at that time any intention on the part of Wolff, Kahn & Co. of making the damage from crushing a distinct subject of claim for compensation apart from the more important injury of the wire from what is called its white damage, which affected the whole of it. The crushing was doubtless viewed as merely an additional circumstance, making the wire unmarketable. The rejection of the wire was based primarily upon the report of Mr. Smith, an employe of Roebling & Co. When asked why the wire was condemned, and what the trouble was, he testified that "the trouble was in this dirt, and this white stuff;" and though he saw some of the bundles crushed, he nowhere

mentions it as one of the grounds for rejecting the wire. And this sufficiently explains why no account was kept of the number of coils crushed; and in any other view the failure to keep an account of these coils would be inexplicable. But inasmuch as, for reasons to be presently stated, I do not find the vessels liable, upon the evidence as it stands, for the white damage, a separate account is necessary of the injury from crushing. The fact, which I must assume, that Wolff, Kahn & Co. did not contemplate the crushing as an independent subject of claim, but only as part of the general damage, of which the other items were the most important, is not a sufficient reason for disallowing the former, now that the court disallows the general claim for white damage, which affected all the coils. While, therefore, the libelants should in this case be allowed for the damage actually proved by crushing, they cannot be relieved from the effect of failure to preserve proper evidence, and can only be allowed what they prove beyond reasonable doubt, nor should they recover beyond the lowest estimate of their own witnesses, who had the best opportunities of ascertaining the number crushed, and who appear to be most credible and most careful in observing and in testifying on the subject. As a reference to ascertain the damage will be necessary in regard to what is called the black damage, I shall not endeavor to determine upon the evidence how much should be allowed for the crushed coils.

2. The white damage. The wire in question was manufactured for telegraph uses by what is called the galvanizing process. This process consisted, in brief, of first cleansing the wire through immersion in some weak acid solution, to remove scales, silicate, or other impurities, and next, after being dried, running it through a bath of molten zinc, on the surface of which floated a flux of sal-ammoniac or muriate of ammonia. In entering the zinc bath the wire first passes down through the flux above and emerges at the other end of the bath, under and beyond a bridge which separates it from the flux, so that it does not go through the flux a second time on emerging from the bath. If perfect, the wire should be entirely coated with zinc and without spots. On the part of the libelants, the evidence is that the wire was delivered in perfect condition to the various vessels, and the bills of lading recite that it was received in good order and condition. The 3,666 bundles embraced in these suits were found upon delivery to be all affected by a corrosion of the zinc coating, which formed a fine, white, floury powder, which could be brushed off in quantities, so as to cover the persons of those handling it, and as the witnesses describe it, making them look like a miller. Complaint being made to the agents of the vessels, some of the wire was examined by Prof. Chandler on the dock, and some samples taken and tested. He testifies that in none of the coils which he examined did he find that the corrosion had eaten entirely through the zinc, so as to expose the surface of the iron beneath. The coils were all sold by September, 1880,

except two, which were preserved as samples and brought into court. These were kept in the mean time in a dry cellar of Mr. Lefferts, where such wire was accustomed to be kept without injury. A careful examination of these coils, and of samples cut from them, by Prof. Doremus and his assistants, shows that in many places the zinc coating was wholly eaten off. On both sides it was agreed that the white powder was an oxide of zinc, produced by corrosion. It was in fact a zinc rust. The evidence leaves no doubt that this process of corrosion, or rusting, was most active where the strands of wire in the coil lay against each other. While the dampness of the atmosphere is insufficient to set this rusting process actively at work, so long as the strands are single and apart, the evidence leaves no doubt that where the strands are in contact with each other, as in these coils, if they be wet by rain or sea water, or where the dampness is such as to condense and form water along the lines of contact, active corrosion will very speedily set in.

The libelants contend that as the wire coils were received on board the vessels in apparent good order and condition, and so receipted for in the bills of lading, the burden of proof is upon the steam-ship company to discharge themselves from their *prima facie* liability for the damaged condition of the wire in which it was delivered. Relying on this principle the libelants have not undertaken to show what were the particular circumstances or causes which set this oxidation at work, but have contented themselves with indicating the possible causes above referred to, which might have happened while the wire was in charge of the steam-ship company, either through rain, excessive dampness and condensation, or sea water.

On the part of the steam-ship company it is contended that according to the testimony of Prof. Chandler, the oxidation, at the time of the delivery of the wire, had not destroyed the zinc coating or rendered the wire unmerchantable; and that as to the numerous places on the samples produced in court after this lapse of time, where, upon the libelants' testimony, the zinc was all eaten off, this had arisen only from the long continuance of the process of corrosion since the delivery of the wire. The evidence of numerous witnesses on the part of the libelants, however, leaves no doubt in my mind that in the rejected bundles the oxidation of the zinc was so extensive and had eaten away the zinc to such an extent as materially to impair its commercial value. The zinc coating on the iron wire is for the purpose of protecting it from the weather; and I have no doubt from the testimony of the various experts in dealing with such wire, that this coating was so extensively affected by corrosion as to impair materially the zinc coating, and to diminish the market value of these coils.

The bills of lading of all these shipments, however, contain an express exception of all "loss or damage resulting from sweating, leakage, breakage, *rust*, decay, rain, spray, loss, or damage from storage,

or contact with, or smell, or evaporation from any other goods." The three last bills of lading, moreover, contain a further written statement at the bottom, as follows, respectively: "Not accountable for any rust;" "not accountable for any rust whatever, or howsoever caused;" "steamer not accountable for any corrosion or rust whatever and howsoever caused."

The white damage in this case consisted of the oxidation or rusting of the zinc. It is described by the witnesses on both sides as an oxidation or corrosion, and Prof. Chandler repeatedly calls it "rust;" and as a *rust* I do not see how it can be excluded from the exception in the bills of lading. That it was intended to be embraced in the written memorandum of exception in the last three bills of lading, under the name of "rust" or "corrosion," seems manifest; for those three bills embraced nothing but galvanized wire, to which this memorandum could apply. But the exception of "rust" in all the bills of lading applies equally to all the consignments. Supposing the masters to have intended to exclude liability for such white damage as this, I do not think they could be expected to have employed the chemical word "oxidation" to express that intention; that word is much too technical and too remote from ordinary commercial language; while the common words "rust or corrosion" do express the idea naturally and perfectly. I do not see, therefore, why the word "rust" should be confined to the oxidation of an iron surface and excluded from the oxidation of a zinc surface, except on proof of such a restricted use of the word. The process of oxidation, or rusting, is the same in both; the injury by corrosion the same; the exciting causes are the same; and there is no reason in the circumstances, or in the liability to such damage on board ship, for supposing that the carriers designed to exempt themselves from injury through iron rust and not through zinc rust. The oxidation of iron produces one kind of rust, the oxidation of zinc another kind. Both are equally and truly rust. The term "rust," though most commonly applied to the red or yellowish rust of iron,—because iron is in much more familiar use than other metals,—includes, as a part of its definition, the oxidation of any other metals, as well as of iron. (Worcest., Johns., Latham, Webst. Dict.) The general term "rust" in these bills of lading must be held, therefore, to have been used in its general sense, as there is no evidence of any restriction of its meaning in commercial usage, and hence be held to include the oxidation of this wire, which forms the white damage referred to.

When the damage complained of is ascertained to be within any of the exceptions of the bill of lading, the burden of proof is then changed, and the carrier is not liable, unless it be shown by the shippers "that the damage might have been avoided by the exercise of reasonable skill and attention on the part of the persons conveying the goods; for then it is not deemed to be, in the sense of the law, such a loss as will exempt the carrier from liability, but rather a loss

occasioned by his negligence and inattention to his duty." *Clark* v. *Barnwell*, 12 How. 272, 280; *The Pereire*, 8 Ben. 301; *Wertheimer* v. *Penn. R. Co.* 1 FED. REP. 232–234; *The Delhi*, 4 Ben. 345. The libel charges such negligence on the part of the carriers, in permitting the goods to come into contact with water, wine, salt, saltpetre, etc., whereby such goods, and all of them, were greatly damaged. But the evidence is wholly insufficient to establish any such negligent acts on the part of the carriers as might have produced this zinc rust. There was nothing in the storage of the wire, or in its proximity to any other kind of goods; nothing in the condition of the holds of the steamers; nothing shown or intimated to have happened upon the voyages which can reasonably be held to have tended to produce this white oxidation, so as to charge the carriers with any actual negligence.

The great mass of evidence taken as to the possible cause of the oxidation of the wire affords no better result than mere conjecture. While the most probable cause would seem to be that portions of it had been wet by rain or sea water, there is nothing to indicate that this took place after the wire came to the hands of the carriers or on board the steamers. *Choate* v. *Crowninshield*, 3 Cliff. 184, 189. The compartments where the wire was stored were dry, the official surveys of the several vessels showed them to be in good condition on arrival, and other wire on the same vessels was uninjured. Subsequent shipments, moreover, which came in closed casks, were also found considerably affected by this same white oxidation, although not to so great a degree, nor such as to prevent acceptance. The carriers rely upon this last fact as evidence that the oxidation arose either from defects of manufacture or from the great humidity of the atmosphere at that season of the year in Holland. Without going further into detail as to the numerous facts bearing upon this point, I will say only that the evidence fails to show what in this case was the actual cause of the oxidation of the wire.

The argument on the part of the importers, however, goes back of the fact of the oxidation or rusting of the wire, and insists that the burden of proof is upon the carriers to show what was the cause of that rusting, and that this cause was within the exceptions of the bill of lading, in order to clear them from liability. I cannot sustain this view of the case. It is enough for the carrier, in the first instance, to show that the damage itself is of a kind excepted in the bill of lading. The oxidation or rust, in this case, is of that character. It is not incumbent upon the carriers, therefore, in the first instance, to discover what it was that caused the rust, and then to show that that particular cause was through no fault of theirs. On the contrary, when it is shown that the damage consists in an oxidation or rust, which is within the exceptions of the bill of lading, then, as above stated, the burden of proof is upon the shippers to show that this rusting arose through some fault of the carriers or some cause which the carrier, by reasonable diligence, might have averted. In the

cases of *The Delhi* and *The Pereire, supra,* plate glass in cases was found more or less broken. The bills of lading contained a clause "not accountable for breakage." In both cases it was held that, although the damage consisted of the simple fact of breakage, the burden of proof was upon the libelants to show that the breakage occurred through some fault of the carrier, or, to state it more exactly in the language of Benedict, J., (8 Ben. 303:) "It is necessary for the libelants to prove some negligent *act* on the part of the steamer in the transportation of the glass, and that such *act* caused the breakage in question;" and in both of these cases the libels were dismissed because no negligent act of the carrier was shown which caused the injury. So, in this case the white damage being a damage from rust, within the exceptions of the bill of lading, the importers cannot recover for this damage, because they have not shown by any satisfactory evidence that it was caused by any act or omission of the carriers.

3. The black damage. The injury intended to be embraced under this head was caused by some black, pasty substance adhering to the wire upon the outer portions of the coils, as though they had been rolled through or had lain in some filthy matter. Mr. Wolff and Mr. Shippy went into the hold of the Vaderland, and they testify that they saw there considerable wire lying underneath and near the hatchway, ready to be hoisted out; that there were some casks of red wine near by from which the wine was oozing somewhat, forming upon the deck a black, pasty, sticky substance like molasses, which would stick to their feet as they walked along; that they saw the wire lying in it, and that a good deal of wire which had been removed from the dock showed the same black, pasty substance upon it, still fresh and wet, and on other portions forming a dry, hard coating. Prof. Chandler noticed these black stains, examined a few, and found that they could be rubbed off by sand-paper or emery, showing the bright zinc beneath. Warrington, an agent of the steam-ship company, observed more or less of this discoloration on several of the shipments. Several of the other witnesses testified that it was mostly confined to the outer circumference of the coils, though sometimes on the flat side, with occasionally some spots on the inside, as though it had trickled through in rolling. The black matter referred to was not ordinary dirt which could be easily removed, and which would not be regarded as materially affecting the commercial value of the wire. It was a substance much more adhesive, which could not be brushed off or removed without rubbing or scraping, and when thus got off would sometimes leave the surface of the iron bare.

The proper method of handling this wire was by carrying the coils, and not by rolling them upon their edges. Numerous workmen were examined, proving that the coils were carried in this manner from the closed cars in which they were brought from Scalke, the place of

manufacture, to and upon the dock along-side the steamers, where they were laid down, with wood beneath, and covered with tarpaulins above. I cannot question, upon the evidence, the fact that a very considerable number of these damaged coils had been rolled, while loading or unloading, through some black, tarry, or very adhesive substance, and that this constituted negligent handling of the wire, making the vessels and their owners responsible for whatever actual damage was thus caused. How much this actual damage was, it is impossible from the evidence taken before me to estimate. From the injury to the general appearance of the wire on the one hand, and the fact that it was plainly superficial on the other, it would seem probable that the injury for practical uses would be much less than its external appearance would indicate. The injury from this cause, moreover, is somewhat complicated with the other defects of the wire. In those places where the zinc had been already eaten off by corrosion before those portions had become incrusted with this black paste, the iron surface, when this black incrustation was removed, would, as a matter of course, appear. And so, also, as regards any defective spots not coated with the zinc in the original manufacture, if there were any such. While the experiments of Prof. Doremus, therefore, sufficiently prove that bare spots of iron appeared upon the removal of this black coating, the coating removed in such cases was not tested for zinc which might have come off with it. The evidence, therefore, as to the amount of the practical injury to the wire for telegraphic purposes, as well as the number of coils affected by this black, pasty incrustation, is inconclusive.

A good deal of evidence was presented in regard to the mode of manufacture, for the purpose of showing that if the process were hurried, imperfections would occur, either through scales or silicates left on the wire, and that these defective spots, if not afterwards covered with zinc, would enlarge in size and produce some of the dark lines or spots shown upon the coils produced in court. These lines or spots could not, however, be confounded with the black incrustation here referred to, but only with the results of the corrosion of the zinc coating, where it had been entirely eaten away.

In the reference which will be necessary to ascertain the amount of damage to the wire from crushing and from the black damage, neither the blemishes above referred to, if any such existed, in the manufacture, nor any of the results of the corrosion, will be considered. The importers are entitled to recover for the damage to the market value of the wire in question, which may have been caused—First, by the crushing of the bundles; and, second, by any of them becoming incrusted with this black, adhesive coating, exclusive of any injury caused from oxidation or white damage. As to each of these two items, the burden of proof will be upon the importer to show the number of coils damaged in either respect, and the difference in the

market value caused by it. When this is ascertained a balance will be struck in favor of one side or the other, as may appear, after charging the importers with the amount of freight unpaid.

The question of costs is reserved. The order of reference to be settled on two days' notice.