MARIA   T.   FERANCE   *vs.*   FORESTDALE   MANUFACTURING COMPANY.

JANUARY 23, 1914.

PRESENT:   Johnson, C. J., Parkhurst, Sweetland, and Vincent, JJ.

(1)   *Master and Servant.   Evidence.   Res Gestæ.*

In an action against a master for the death of a servant caused while attempting to place a belt upon a revolving pulley statements by deceased a few minutes after the accident that he told the "boss" when he went upstairs to get him, that he did not want to go down stairs and that when he went down with the "boss" and was told to put on the belt he told him that he did.

not want to do it and he forced him to do it are inadmissible as part of the *res gestæ*, since they relate to a state of mind of deceased at a time prior to the injury, in a part of the mill other than the room where the injury took place and throw no light upon the nature or cause of the injury, and their admission constituted reversible error.

(2) *Master and Servant. Evidence. Res Gestæ.*

In an action against a master for the death of a servant where it was alleged in some counts of the declaration that deceased was taken from his regular work and told to hurry and put on a belt; that this was not a part of his work and he was not accustomed to it, statements by deceased shortly after the accident, that he did not want to go down stairs and that when he went down and was told by the "boss" to put on the belt he objected, are not admissible as proof of such allegations, especially since plaintiff's own witnesses had previously testified that intestate was a skillful man accustomed to such work.

Trespass on the Case for negligence. Heard on exceptions of defendant and sustained.

Parkhurst, J. This is an action of trespass on the case for negligence and is now before this court upon the defendant's bill of exceptions. The case was tried before a judge of the Superior Court and a jury, January 23–28, 1913, and at the conclusion of the trial a verdict was rendered for the plaintiff in the sum of $4,800. The defendant thereafter duly filed its motion for a new trial, but before a hearing could be had upon this motion, the trial judge resigned his position as justice of said Superior Court. Counsel for both parties then came before another judge of the Superior Court who overruled the defendant's motion for a new trial as a matter of form, without listening to arguments of counsel. The defendant thereafter duly filed its petition in this court, in accordance with the statute, to establish the truth of its exceptions and the correctness of the transcript of evidence given at the trial of the case. This petition was granted and the case is now before this court upon the said bill of exceptions presented to the court by the petitioner.

The plaintiff's declaration contains eight counts. In the first it is alleged that on January 3rd, 1911, the plaintiff's

intestate, Manuel T. Ferance, was employed in the defendant's dye house at Forestdale; that while so employed he was suddenly directed by the defendant's agent in charge of said dye house to leave his regular work and to put upon a rapidly revolving pulley a belt which had slipped off; that it was not a part of his work to put on belts and that he was not accustomed to putting on such belts; that he should have been cautioned and instructed; that he received no caution or instructions, but was ordered to hurry and put the belt on; and that while attempting to do this he was caught by the belt and wound around the pulley and shaft and so severely injured that he died a few hours later.

In the second count, after similar allegations as in the first count, it is alleged that he informed the "boss" as to his unfamiliarity with such work; and that it was the duty of the defendant to stop or check the speed of the pulley so that Ferance would not be exposed to great danger in putting on the belt; and that the defendant failed to do this, and as a result Ferance was caught by the belt and wound around the pulley and shaft, etc., as before alleged.

The third count, after allegations similar to those in the second count, alleges that it was the duty of the defendant to furnish Ferance with a proper appliance or tool with which he might safely put the belt on the pulley while in motion; that a small unsuitable stick was furnished instead, and that as a result of the breaking of the stick when being used by Ferance in putting on the belt, he became entangled in the belt, pulley and shaft and received such injuries that he died soon after.

The fourth count is similar to the second count in that it alleges the duty violated to be that the defendant failed to lessen the speed of the pulley when Ferance was attempting to put on the belt, but there is no allegation that Ferance was unfamiliar with such work.

The fifth count is similar to the third in that it alleges that the duty violated was that an improper tool or appliance,

namely, a stick, was furnished to said Ferance to assist in putting on the belt, but there is no allegation that Ferance was unfamiliar with such work.

In the sixth count it is alleged that Ferance was ordered to put on a belt which had been shortened to such an extent that it could not be put on the pulley while in motion without great danger to him; that since he was ignorant of this condition, the defendant was under the duty of stopping or checking the speed of the pulley while he attempted to put on the belt, and as a result of the violation of this duty, Ferance was fatally injured.

In the seventh count the same allegations are made, except that the duty alleged to have been violated was that of so lengthening the belt as not to expose the deceased to so great danger in putting it on the revolving pulley.

The eighth count alleges that deceased was ordered to go and at once put a belt on a rapidly revolving pulley; that this belt had been shortened to such an extent that it could not be put on without great danger; that two other employees had been unable to put on this belt and that these facts were known to the boss and not known to the deceased; that, although the deceased was ignorant of these facts, the defendant failed to inform him that the belt had been so shortened, and as a result, the deceased in attempting to put it on the moving pulley was fatally injured, as before alleged.

At the trial the plaintiff offered no evidence to sustain the allegations that the work of putting on belts which had slipped off was not a part of the work of the deceased and that he was not accustomed to such work; but on the contrary the first witness called by the plaintiff testified that such work was a part of the work of the deceased and had been such for several years; that he was accustomed to such work, and was regarded as a skillful and competent man for that purpose on account of his experience. And there is nothing in any part of the record to show that this was not a fact, but on the contrary the testimony of other witnesses corroborated that of the first witness.

Nor was there evidence to sustain certain other allegations, to wit: that it was the duty of the defendant to stop or check the speed of the pulley under the allegations of fact as set forth in the second, fourth and sixth counts; or that the stick furnished the deceased was unsuitable as alleged in the third and fifth counts; and it appears from the transcript that at the conclusion of the testimony and after the arguments of counsel, it was deemed by the trial judge that the case should go to the jury only upon the seventh and eighth counts.

The facts as they appear in the transcript of the testimony are briefly as follows:

The defendant company was in January, 1911, engaged in the manufacture of textiles, with a plant at Forestdale.

For about four years prior to January 3, 1911, the plaintiff's intestate, Manuel T. Ferance, also known as Francis and as Frank Davis, was employed by the defendant as a "handy man" in the dye house, to do whatever he was called upon to do. Previous to the accident he had frequently put on belts and was regarded as the experienced man in the dye house to put on belts, and it is stated that before the time of the accident he put them on at least two or three times a week, sometimes downstairs in the dye house and at other times upstairs in the drying room of the defendant's mill.

At the time of the accident there were several washing or dyeing machines in defendant's dye house, one of which was operated by Thomas Conley. This machine was fifteen or eighteen feet long and power was communicated to it by a belt of rubber and canvas composition three inches wide and about thirty feet long. This belt ran diagonally from a twelve-inch pulley on the right hand side of the machine about three or four feet from the floor up to a fifteen-inch pulley on the shaft which was twelve to fifteen feet from the floor. This belt, when in position, was crossed so as to drive the pulley on the machine in an opposite direction from the pulley on the shaft. The shaft,

which carried this pulley, ran the length of the dye house and was then connected by a belt to another shaft, which was connected directly with the main shaft of the mill. Consequently, the only way in which the power on the shaft in the dye house could be shut off was by shutting down the engine which furnished power to the entire mill. This dye house shaft, when running, made about two hundred revolutions per minute, and was what would be generally called a medium speed shaft. It was also in evidence that the belt in question and other belts in the dye house were continually stretching on account of the damp atmosphere and, consequently, the belts had to be shortened frequently in order to make them tight enough to run the machines.

At about half past seven on the morning of January 3rd, 1911, the overseer of the dye house, Mr. Walter G. M. Smith, the plaintiff's first witness, discovered that a belt on Conley's washing machine was "too loose" and "not tight enough to drive the machine." Mr Smith testified that he then "tightened it up a little bit and took an inch off of the belt to make it tight." After the belt had thus been shortened, Conley, who had been employed about a month or a little over, tried to put the belt on but was not successful. Conley then told Smith that he could not get the belt on and thereupon Smith went upstairs to the drying room to get Ferance to put on the belt. Smith says that he simply told Ferance that there was a belt off in the dye house and told him to put it on; that they both went down in the elevator together and Ferance made no objection to obeying the order to put on the belt. It appears that, just before Smith went upstairs to get Ferance, Frank Warzewa, who ran the next machine to Conley's, made a partial attempt to put the belt on this pulley. He took the belt in his hands and climbed the ladder but got afraid and came down.

When Smith and Ferance reached Conley's machine, Ferance asked for a stick, and received one such as was used for a dye stick; Ferance went up the ladder and used this stick in his attempt to put on the belt. Warzewa

testified that just as Ferance was going up the ladder, he (Warzewa) said to him in English, "No try.   Too short," and that Ferance in reply laughed and told Warzewa that he was too small to put on the belt.   The plaintiff's witness, Turton, then says that he saw Ferance lift the belt with his right arm, and that, with the aid of a stick in his right hand, he got the belt a little over half on.   While Ferance was trying to put the belt upon the upper pulley, the belt, Turton said, came off the lower pulley, carrying the shipper with it. The belt then flew up, wound around Ferance's right arm and caused him to be carried around the shaft until the power was shut off.   After some minutes of work the fellow workmen of Ferance were able to take him down from the shaft where he was hanging and then placed him on a truck nearby.   Apparently he was conscious until taken away to the hospital, where he died within a few hours.

The defendant's first four exceptions relate to the admission by the trial judge against objection made on behalf of the defendant of certain statements alleged to have been made by the deceased immediately after he was injured, and appear upon pages 73-76 and 89-91 of the transcript of testimony.

The nephew of the deceased, John T. Ferance, a witness for plaintiff, testified that at the time of the accident he was working in defendant's spinning room upstairs.   He first noticed that the power was shut off and then heard some one say, "that the fellow got hurt in the dye house."   He hurried downstairs to the dye house where he found the deceased lying on a truck covered with a blanket.   This witness says it took him about two and one-half minutes to get from the spinning room to the side of the injured man, who had just been taken down from the shaft and laid upon a truck when this witness arrived upon the scene of the accident. This witness testified as follows, transcript pp. 73-76:   "Q. Did you say anything to him?   A.   I shake hands with him and I ask how he done that and he told me.   Q.   What did he say to you at that time as he was lying on this truck?

Objected to by Mr. Gardner.  MR. PHILLIPS:  I offer it as part of the *res gestæ*.  The former witness testified it took two or three minutes to get him down from the shaft and this man says that his speed was stopped on the shaft, which was done immediately after the accident and he came right down and it took him he said two minutes to get there. WITNESS:  About two minutes and a half, about.  MR. PHILLIPS:  So it would be within four or five, five or six, or seven or eight at the longest from the time when he got caught and there are a good many decisions in our own State on that point.  THE COURT:  It doesn't accord exactly with my view of the *res gestæ*, but on that decision in the Murphy case I will let it go in.  Defendant's exception noted.  Q.  Was he suffering pain at the time?  A.  He was.  Q.  When he told you?  A.  Yes.  Q.  And you have already described his injuries at that time and what did he say to you at that time?  A.  He told me when I came there, he told me he was working upstairs on the dryers and about half past seven the boss went upstairs to get him down to put on the belt.  He told the boss he didn't want to come down, so he came down in the elevator and came down both together.  When he came down he told him to put on the belt.  He don't want to put it on the shaft and he forced him to do it and he told him he didn't want to put on that belt because it ain't in his work.  Q.  You are not to say anything he didn't say.  A.  He told me that.  Q.  Is that what he said?  A.  Yes, sir.  MR. GARDNER:  I renew my motion to strike out that answer on the ground that it is not in the nature of statements that are ever allowed in *res gestæ*.  They are ejaculatory statements and not long drawn out narrative statements of that nature.  MR. PHILLIPS: I have decisions on that particular point.  MR. GARDNER: I am not objecting now on account of the time.  I am objecting on account of the character.  THE COURT:  In the Champlin case it was a brief statement of the motorman. MR. PHILLIPS:  In the Murphy case the man told about an assault upon him.  Told it at first and ten or fifteen minutes

later he repeated it and told about how he had been robbed and the other circumstances. THE COURT: My own view, I may say, is always with the idea that *res gestœ* remarks are spontaneous and ejaculatory, that is, impulsive, without reflection, but I don't feel at liberty under the decisions our courts have made and so although this is in the nature of a statement made here of a narrative, I will let it stand and you may take an exception, Mr. Gardner. Without authority I should think it was not admissible."

Christian Costa, a witness for the plaintiff, testified as follows, transcript pp. 89-91: "Q. Did he say anything while he was on the shaft to you? A. Yes, sir. Q. What did he say while he was on the shaft to you? MR. GARDNER: The same objection I had yesterday. THE COURT: I will allow the question. A. He said he was in that condition because it was due to the boss. MR. GARDNER: That is a matter of opinion which must be based on the facts. If the dead man was on the stand, he wouldn't be allowed to testify as to whose fault it was. THE COURT: Why isn't that open to that objection? It is a conclusion. MR. PHILLIPS: It is merely his idea of it and may not be worth very much or worth so much as if he had stated certain facts. THE COURT: If he were alive and testified, it wouldn't be admissible and it isn't any more admissible if he is not here, is it, such a statement as that? MR. PHILLIPS: I will ask the witness if he said anything else. MR. GARDNER: I would like to have the answer stricken out. THE COURT: Very well. Ask him if he said anything else. Q. Did he say anything else? A. He says that he didn't want to come. MR. GARDNER: All subject to the same objection. THE COURT: Same objection, yes. Q. Was that all he said when he was up there on the shaft? A. Yes, sir. Q. What was done when he was taken down from the shaft? A. They put him on top of a truck which was on a table. Q. And about how long was it before you got him down from the shaft and put him on this truck? A. I can't say because I didn't notice at the time. Q. Was it a short

R. I.] Ference v. Forestdale Manufacturing Co. 163

time? A. Yes, it was a short time. Q. Would you say it was more than two or three minutes? A. Yes, it must have been more than two or three minutes. Q. How long should you say it was? A. I can't say because I didn't notice. Q. When they put him on this truck did he say anything to you about how the accident happened? A. Yes, sir. Defendant's exception noted. Q. What did he say then? A. He told me while he was on the table that if he was in that condition it was the boss's fault. MR. GARDNER: I ask to have it stricken out. THE COURT: That may be stricken out. Q. Did he say anything else besides that? A. He didn't tell me anything else. Q. Did he say anything about where he was working before he tried to put on the belt? A. Told me that he had been upstairs. Q. Did he say whether or not the boss told him to put on the belt? Objected to by Mr. Gardner as leading. Question withdrawn. Q. Did he say whether the boss told him anything? A. He told me that he didn't want to come and put the belt on, but the boss sent him. Q. Did he say whether the boss told him anything? A. No, he didn't tell me anything but that.''

We are clearly of the opinion that the trial judge was in error in permitting these statements, alleged to have been made by the deceased, to stand as evidence before the jury. Counsel for the plaintiff claimed that they were a part of the *res gestæ*, and appears to have persuaded the trial judge, somewhat against his own impression as to the rule of evidence, that these statements were admissible on the authority of the ''Murphy case,'' meaning the case of *State* v. *Murphy*, 16 R. I. 528, 530. It is not at all clear from the transcript just what bearing either counsel for plaintiff or the trial judge thought the Murphy case had upon the admissibility of this evidence. Apparently the question of the lapse of time after the injury, before the statement was made, was the matter to which counsel for plaintiff was directing his attention, while counsel for the defendant seems to have objected on the ground that the

statement was a "long drawn out and narrative" statement. The trial judge apparently thought that the Murphy case was authority for the admissibility of statements made by the injured person a longer time after the injury than the time elapsed in the case at bar, and was also authority for the admissibility of narrative statements of considerable length, and so it is.   But in the Murphy case two statements of the deceased made after a murderous assault, were held to have been properly admitted, the first statement being made by the injured man immediately after the assault and the other being made ten or fifteen minutes later.   Both statements were to the effect that he had been robbed and about killed by two men whom he described.   Both these statements related to the cause of the injuries from which the injured man was suffering, and showed by whom they were inflicted, and so were directly relevant and explanatory of the existing state of things.   The objection of defendant's counsel in the case at bar was also based upon the character of the statements.   We are unable to perceive how the statements attributed to the deceased in this case, if in fact made, (2) could be regarded as part of the *res gestæ* or as in any sense relevant or material.   They relate to a state of mind of the deceased at a time prior to the injury, in a part of the mill other than the room where the injury took place, before he had even seen the belt which he was directed to put upon the pulley, and seem to consist simply of an expression of unwillingness to do what was required of him because it was no part of his work.   They throw no light upon the nature or cause of the injury, and give no assistance whatever in determining how it happened.   Counsel for plaintiff now contends before this court, although it does not appear from the transcript that he made any such contention at the trial, that, as it was alleged in several counts of the declaration that the deceased was taken from his regular work and told to hurry and put on the belt, that it was not a part of the work of the deceased to put on belts and that he was not accustomed to such work, these statements alleged to have

been made by him just after the accident were relevant and admissible as proof of those allegations. They fall far short of proof of any of those allegations. Furthermore, as already shown, the first witness called by the plaintiff testified that the deceased was a skillful and competent man accustomed to this kind of work, that it was a part of his work, and that he frequently did such work; and this proof was already before the court and jury at the time when this evidence of the statements of the deceased was offered. Counsel for plaintiff also contends that, because the trial judge in his charge to the jury told them to consider only the allegations of the seventh and eighth counts, and that the other counts were eliminated by reason of the fact that there was no evidence to sustain them, this was in effect a withdrawal of the evidence above quoted from the consideration of the jury. A careful examination of the charge to the jury does not show that the jury was instructed not to consider this evidence; nor does it appear that the jury were so clearly instructed as to the nature of the several counts of the declaration that they would or should have had a clear idea of what evidence was relevant to the seventh and eighth counts or that the evidence here under consideration was irrelevant and immaterial.

We are of the opinion that the evidence was not admissible as part of the *res gestæ;* and that it was of such a character as tended to prejudice the jury against the defendant. The defendant's exceptions numbers 1-4, inclusive, are sustained.

The sixth exception relates to a certain portion of the charge to the jury wherein it is claimed by the defendant's counsel that the trial judge misstated certain portions of the testimony with reference to the slipping of the belt from the lower pulley at the time when the deceased was attempting to put the belt upon the upper pulley, and stated to the jury that it was a fact that the belt did so slip, and further stated, "That might be conclusive in this case." The seventh exception relates to portions of the charge to the jury wherein it is claimed that the trial judge further

misstated the testimony with reference to what Conley told Smith, the "boss," as to the tightness of the belt. A careful consideration of the charge in these respects leads us to the conclusion that the trial judge erred in his statements regarding the facts referred to and the inferences that might be drawn therefrom. It is impossible now, from the transcript before us, to state clearly just what instructions were given to the jury and it would be a waste of time to attempt to say in detail in just what particulars and how far the judge was in error in these respects. It is enough to say that in our opinion the charge tended to confuse and possibly to mislead in the matters suggested by these exceptions and the same are therefore sustained.

As to the eighth exception, we find that the judge properly charged as requested, and the exception is overruled.

The other exceptions relate to the weight of evidence; the fifth being to the refusal of the trial judge to direct a verdict for the defendant after the close of the testimony; and the ninth, to the denial of defendant's motion for a new trial. In our view of the case, as a new trial should be had, on account of certain errors above pointed out, it is not necessary and would be improper for us to discuss the weight of the evidence. Neither party has had the benefit of the judgment of the judge who tried the cause and heard and saw the witnesses, upon this phase of the case, as intended under our present practice. The judge who heard the defendant's motion for a new trial not having had the opportunity of seeing and hearing the witnesses, acted only *pro forma;* and it can never be known what would have been the judgment of the trial judge upon this matter. We think the case should be submitted to another jury.

The defendant's exceptions numbered 1, 2, 3, 4, 6 and 7 are sustained, the others are overruled and the case is remitted to the Superior Court for a new trial.

*Green, Hinckley & Allen,* for plaintiff.
*Abbott Phillips, Chauncey E. Wheeler,* of counsel.
*Gardner, Pirce & Thornley,* for defendant.
*Charles R. Haslam,* of counsel.