## SALTEX LOOMS, Inc., et al. v. COLLINS & AIKMAN CORPORATION.

District Court, S. D. New York.

March 11, 1942.

E. Clarkson Seward, of New York City (E. Clarkson Seward and W. Saxton Seward, both of New York City, of counsel), for plaintiffs.

Darby & Darby, of New York City (Samuel E. Darby, Jr., Albert Jube, and Walter A. Darby, all of New York City, and Paul J. Schmitz, of Philadelphia, Pa., of counsel), for defendant.

GALSTON, District Judge.

The plaintiffs allege infringement of letters patent to Crabtree, No. 2,007,078, issued July 2, 1935, for an invention in pile fabric. The answer, in addition to denying infringement and alleging invalidity, sets forth a counterclaim, alleging infringement by the plaintiffs of eight letters patent. At the trial only four of these were relied upon, that to Curtis, No. 2,033,881; to Hiers, No. 2,070,335; to Bird, No. 2,070,-251, all relating to pile fabric; and to Drobile, No. 2,001,488, covering an apparatus for coating fabrics. The reply denies infringement and alleges invalidity of the counterclaim patents.

Of course, weaving is a very old art. The Crabtree patent on its face covers only a very narrow contribution to the art. Though it bears the filing date August 10, 1926, the patent was not issued until almost nine years thereafter, having had, as Judge Graham said in Re Crabtree,

Cust. & Pat.App., 74 F.2d 998, "a rather tortuous course in the Patent Office." Indeed one of the defenses most strenuously urged against the patent is that a claim of a different invention was injected into the application more than six years after it was filed. The invention particularly relates to pile fabrics such as upholstery plushes, which are used as coverings for the seats and interiors of automobiles. The objects sought were to prevent the pulling out of pile threads, the stiffening of the pile on the face of the goods, and supporting it in erect position. These ends were achieved by applying to the pile fabric a cementitious or viscous coating on the reverse side.

The specification states that pile fabrics such as upholstery plush are usually woven with a mohair or worsted pile, and that before the invention in question it had been considered necessary to produce them with what is known in the art as a "fast pile" weave, in which the pile threads are interlaced with and bound under a plurality of the weft threads in the body of the cloth. Crabtree observed that that process consumed a considerable amount of the pile yarn, which is the most costly element of the cloth. A large percentage of the pile material is taken up by the loops over and under the weft threads, which loops or V's serve to bind the pile firmly into the ground or back of the fabric, but do not add to the "cover" to render the pile more dense. Moreover, the fast pile fabrics in which the V's pass above the weft threads show through on the face of the cloth and affect its appearance. This objectionable feature was known as "grinning" through of the back of the cloth.

On the other hand, the art also knew "a loose pile" fabric, the pile of which is bound into the ground by single picks of weft, each pile thread being looped under one weft thread without overlying adjacent picks of the weft. In this type of weave the objectionable grinning through is eliminated. On the other hand, said the inventor, loose pile fabrics were not suitable for upholstery goods since the pile was not securely and permanently bound into the ground or back of the cloth. Moreover, in such woven fabric, the pile ends do not stand erectly so that the surface of the cloth fails to present as satisfactory an appearance as that of a fast pile; nor does it have the capacity of a fast pile to resist wear.

Accordingly the Crabtree invention was directed to improvements in so-called loose pile fabrics and contemplated the anchoring of the pile into the ground by means of a cementitious or viscous coating, for example, a cellulose compound such as pyroxylin, or a rubber composition, or any other viscous fluid capable of adhering to the back of the fabric and hardening thereon. In applying the rubber compound the usual procedure is to place the fabric between a pair of calender rolls which squeeze on a thin layer of the coating. It is stated that when the coating is applied to the loose pile fabric it will impregnate and penetrate between the interlaced threads to a certain degree, not, however, passing through the weave to such an extent as to show on the face of the goods. The coating is hardened or set by subjecting it to a drying action, and thereafter it acts as a binding agent to unite the threads in the body or ground of the fabric. Thus it is asserted that with this improvement an ordinary loose pile fabric may be manufactured at less cost than a fast pile fabric and is rendered equally durable.

As issued the patent had but a single claim which is very lengthy and detailed. It reads: "A textile pile fabric intended for frictional wear comprising, a ground of interwoven warp and weft threads, rows of substantially uniform and substantially uniformly spaced interwoven loose warp pile V's each looped about a single weft thread but not interlaced with the ground so as to be thereby firmly held therein, said weft threads being spaced no further apart than the diameter of the pile threads and alternate weft threads being in contact with the ends of intermediate pile V's, said fabric being devoid of extra or additional threads which would normally be necessary to secure the V's therein and to render the fabric suitable for frictional wear, whereby, due to the absence of said extra threads, the V's would be liable to assume less erect and less uniform position and to pull or push out of the ground when subjected to frictional wear, said fabric embodying a thin application of cementitious binding material on the back of the ground which penetrates the interwoven threads but does not conceal the weave and unites the loops of the V's with the interwoven ground warp and weft threads to anchor the V's against pulling or pushing out of the ground or assuming a less erect or less uniform position, whereby the fabric is rendered suitable for frictional

wear and its uniformity and appearance are improved without sacrificing its folding and rolling characteristics."

In this claim the words "but does not conceal the weave" were by certificate of the Patent Office cancelled to conform to the record of the case in the Patent Office.

It will be necessary to consider the history of the Crabtree application in the Patent Office.

As originally filed, the application set forth other objects of the invention than those stated in the patent as issued. One was to provide "a waterproof" coating; another to provide a pile fabric "having stiffening material incorporated in its structure" so as to render it unnecessary to paste or glue the fabric to cardboard "as is the usual practice to prepare it as a lining for tacking on to the frame of the vehicle body." As originally filed, the application was not limited to pile fabrics of any particular type of weave, as it was asserted that certain of the benefits and advantages would follow its use with fast pile fabrics. It was also stated that in applying the coating, one or more applications could be made in accordance "with the thickness and stiffness required."

During the prosecution of the application in the Patent Office, passages relating to these objects were cancelled, as were also all of the ten claims forming part thereof.

In the first action of the Patent Office, a patent to Tully, No. 1,223,538, was cited to show the use of a coating which, to some extent, penetrated the rug or mat. In meeting this reference the inventor, Crabtree, urged that his prime purpose was to effect such penetration of the coating as would anchor the pile threads to the body of the cloth.

In the next action of the Patent Office the claims were again rejected on the reference to Tully and on the ground that the claims were also substantially met by the patent to Bartlett, No. 1,271,005. Meeting these references the applicant insisted on distinguishing between the upholstery goods to which his invention related and the floor rugs or mats of Tully and Bartlett, and in so doing again emphasized the difference between fast pile fabrics and the loose pile fabrics of the upholstery division, and insisted that the problem presented in the upholstery art was quite different from that in the rug or carpet art. He said again in respect to Tully that there was no suggestion by him that the backing was intended to bind the pile into the structure of the weave. Tully sought merely to prevent slippage of the rug or mat on a polished floor. And as to Bartlett, he asserted that the whole Bartlett fabric was imbedded in the compound, the object being to render the material impervious to dust and dirt on its under side, and also to cause it to adhere to the floor to obviate slipping, with the pile projecting only a slight distance above the top surface of the mat. It was urged that such a fabric would not be suitable at all for use as upholstery goods.

The new claims having again been rejected on the reference to Bartlett, British Patent No. 2808 of 1861, and on reference also to the Goodall patent, No. 209,805, as showing the use of an adhesive to hold the fibers of a plush fabric in place, the Patent Office on April 10, 1929 suggested certain claims for the purpose of an interference proceeding. Such claims were thereupon filed by the applicant for the purpose of an interference, involving applications of Crabtree, Curtis and Nutter. It will be sufficient to make reference to Count 3. It reads as follows: "The method of making a fabric comprising interweaving threads to form a fabric having a subnormal number of threads for the use to which the fabric is to be put, and then applying to the back face of the fabric a thin film-like coating of binding material which binds together the threads exposed on said back face and thus imports into the fabric sufficient strength to make good the deficiency resulting from the use of the subnormal number of threads."

Another interference proceeding naming the same parties was declared shortly thereafter involving other claims of the respective applicants.

These interferences were dissolved by the Commissioner of Patents upon recommendation of the Board of Appeals on the ground of non-patentability. Thereupon, on October 19, 1932 Crabtree amended his specification by adding thereto those passages which now appear in the patent on page 2, lines 66 to 75, column 1, and lines 1 to 51, column 2; and he cancelled his claims and added two new claims, one for a fabric and one for a method of making the fabric, wherein for the first time there appeared the limiting phrase "said fabric being devoid of extra or additional threads which would normally be necessary for securing the V's therein and rendering the fabric suitable for its intended

use, whereby, due to the absence of said extra threads, the V's would be liable to assume a less erect position, a less uniform position, and to pull or push out of the ground when subjected to frictional wear, thereby rendering the fabric unsuited for its said intended use, said fabric including a thin coating of non-water-soluble cementitious binding material on the back of the ground, penetrating the interwoven threads, but not concealing the weave, etc."

At this point it will be helpful to refer to the file history in the first of the two declared interference proceedings.

The Board of Appeals, referring to expressions in the counts such as "interweaving threads to form a fabric having a deficiency of threads for the use to which the fabric is to be put * * *, interweaving threads to form a fabric having a deficiency of threads for upholstery purposes, * * *, interweaving threads to form a fabric having a subnormal number of threads for the use to which the fabric is to be put" said: "We have carefully considered the Crabtree specification and find no support for such expressions. While reference is made to a 'loose' pile fabric, this seems to be defined as a pile fabric in which 'each pile thread' is 'looped under one weft thread without overlying adjacent picks of the weft'. It is stated also at the bottom of page 4 that the 'loose pile fabrics are not suitable for upholstery goods since the pile is not securely and permanently bound into the ground or back of the cloth'. This seems to be only a reference to the usual V-shaped tufts in ordinary woven fabric. There is no suggestion of reducing the usual number of weft or warp threads to cause a saving of material and allow the backing or coating to take the place of these omitted threads in strengthening the fabric. We consider that the party Crabtree cannot properly make the claims forming the issues of the interference, and reverse the examiner's decision as to this matter."

It was only after this decision that the amendment of October 2, 1932 was made to the specification and claims of the Crabtree application.

Accordingly the defendant most strenuously urges that the Crabtree patent is invalid, for the amendment of October 19, 1932 injected new matter on which the claim of the patent substantially relies. The claim in part defines the fabric as one "devoid of extra or additional threads which would normally be necessary to secure the V's therein and to render the fabric suitable for frictional wear". The defendant argues that this feature was not disclosed in the original application as filed. It will be recalled that the application for the Crabtree patent came before the Court of Customs and Patent Appeals from a decision of the Board of Appeals of the United States Patent Office, rejecting certain claims of the application. It is true that this was an ex parte proceeding. Nevertheless it must be observed that that court said in overruling the Board of Appeals: "However, we think it is clearly shown by the specification and drawings that the appellant intended to make a pile fabric in which there were no extra warp and weft threads, and where the V-shaped pile threads were looped about only one weft thread. In other words, the fabric proposed by him was of the so-called 'loose pile fabrics,' and, while the appellant alludes to the fact in his specification that certain features of his improvement will be beneficial to a fast pile fabric, we think it is clear from the entire application and specification that the invention has to do with loose pile fabrics of the V-type in which no extra threads are used, and by means of which a fast pile fabric may be constructed at small cost and with greater celerity and ease." 74 F.2d page 999.

I agree with that interpretation of the application as filed. The defendant's position that new matter was injected in the amendment of October 19, 1932, which was not justified by a fair reading of the original specification, cannot be sustained.

It is also objected that the original specification does not justify that part of the claim which refers to "a thin application of cementitious binding material on the back of the ground", but Crabtree's original application did refer to a thin layer of the coating, and states: "In applying a rubber compound the usual procedure is to pass the fabric between a pair of calender rolls which squeezes on a thin layer of the coating."

It cannot be fairly argued that because Figs. 1 and 2 show a relatively thick coating, such was to be the practical embodiment. Certainly there is no contention that the illustrative figures would serve as working drawings. Language in the specification as originally filed, that one ob-

ject of the invention was to provide a pile fabric "having stiffening material incorporated in its structure" so as to render it unnecessary to paste or glue the fabric to cardboard "as is the usual practice to prepare it as a lining for tacking on to the frame of the vehicle body", does not compel the inference that the only type of pile fabric sought was one having such stiffening material with the degree of thickness illustrated in the drawing. It seems quite clear from the reading of the specification that the degree of coating was dependent upon the purpose for which the pile fabric was to be used.

■ Another point raised is that there is nothing in the specification as originally filed which warranted the inclusion in the claim that the "fabric is rendered suitable for frictional wear, and its uniformity and appearance are improved without sacrificing its folding and rolling characteristics." That argument, however, ignores a passage in the original specification which recites: "Another object of the invention is to provide a pile fabric of the type specified which, because of the coating on its back, does not require to be stiffened or reinforced with a cord or rubber tube when made into beading or binding for use in trimming the interior of the vehicle body," as well as the passage: "When the coating is applied to the back of a fabric of this type, it will impregnate and penetrate between the interlaced threads to a certain degree; not, however, passing through the weave to such an extent as to show on the face of the goods."

There is nothing here indicated or in other passages which requires a thickness of coating which would sacrifice the "folding and rolling characteristics" of the fabric.

Moreover it is stated in the original specification that the beading for trimming the interior of the body has been formed by sewing strips of the fabric over a cord or rubber tube, but with the present improved stiffened fabric "the beading or binding may be made up without the inner cord or tube by simply folding the cloth in strips and stitching its edges together."

Finally it was said: "It is also to be understood that various modifications may be made in the character of the weaving of the fabric, in the composition of the material used as a coating, and in the method of applying the coating without departing from the spirit and scope of the invention."

Thus the defendant's contention that Crabtree's claim is not supported by his original application cannot be sustained. On the contrary, the fair inference is that the coating as defined particularly in original claims 1, 2, 7 and 10, was to be only sufficient to overlie the back of the pile and anchor the loops of the pile threads to the fabric.

■ More serious, however, is the contention that the Crabtree patent is invalid for want of invention. What was the Crabtree invention? Despite the devolution of the generic claims of the original specification into the lengthy detailed specific claim of the patent, occasioned by repeated rejections of the Patent Office, in essence it was the application of the cementitious coating to a fabric. As an alleged new article of manufacture, Crabtree believed his invention was a pile fabric having a coating overlying its back with the loops of the pile of the fabric imbedded in the coating in order to anchor them to the fabric. He did not claim that the fabric itself without the coating was new, nor that there was anything novel in the weave. He asserts that what he did was to overcome certain disadvantages attending the use of a fast pile weave and of a loose pile weave in effect by substituting for the stuffer or cover warp, which was the means employed in the old art to meet those disadvantages, a cementitious coating to the back of the fabric. Well, that was a meritorious conception, but did it rise to the dignity of an invention?

Possibly if a cementitious coating had been unknown in the weaving art, one might find invention in this alleged combination of fabric and coating, but such coatings were known in the art. As early as 1860, Patent No. 28,484, was issued to Hill for a manufacture of pile fabrics. Hill disclosed a fabric in which the pile composed of wool hair or other animal or vegetable fiber, interwoven with a web of cloth was "treated on the back of the material so combined with one or more coats of elastic gum or varnish for the purpose of securing the pile to the web, and of rendering the fabric waterproof * * *". The articles were to be used as rugs, riding robes, blankets, or for external wearing apparel, etc. Significantly also appears this passage: "When taken from the loom the pile is trimmed to an even surface * * *. This enters all the interstices * * * and in addition is par-

920

ticularly designed to secure the tufts of pile from being pulled or drawn out from wear when in use."

Another early patent, that to Goodall, No. 209,805, issued in 1878, contained this claim: "As a new article of manufacture, the nap or plush fabric * * * formed from loosely twisted yarns or threads, and having the fibers that form the nap * * * held in place by means of a coating of adhesive cement applied to the back of the fabric * * *."

And considerably later, in 1918, Patent No. 1,271,005 was issued to Bartlett for a floor covering. This specification recites that a textile fabric is partly imbedded in and "surfaced on one side with a flexible and waterproof material." Bartlett said he did not wish "to be limited to this form of fabric, as I contemplate the use of fabric with loosely woven woof or weft threads as well as fabrics having a nap."

But not only does the prior art show the use of a cementitious coating and the function which such coating served, but there was also a patent issued to Lister and Reixach, No. 263,416 in 1882, for a machine for finishing pile fabrics, wherein reference is made to a stiffening material spread on the back of pile fabrics. It is true that this patent does not describe the type of stiffening material so applied. But in a later patent to the same inventors, issued 1890, No. 425,437, they refer to gum as the agent. So if these patents of the prior art are not complete anticipations of the Crabtree claim, there is enough shown therein, in addition to the admissions of Crabtree that he claims no novelty in the weave, to demonstrate that all the elements of the claim were well understood and defined in the art. To say that anything more than mechanical skill was exercised in the development of the Crabtree product would be flying in the face of principles which have been stated repeatedly by the Supreme Court, and most emphatically in the most recent case, Cuno Engineering Corporation v. Automatic Devices Corporation, 314 U.S. 84, 62 S.Ct. 37, 41, 86 L.Ed. ——, in determining the question of invention.

■ The term "invention" has not yielded to affirmative judicial or statutory definition. To apply as a practical test the requirement of "the flash of creative genius" suggested in Cuno Engineering Corporation v. Automatic Devices Corporation may not always be free of difficulty. Especially would this be so in appraising conceptions developed in research laboratories. However, each group of facts would determine its applicability. Certainly though, in the circumstances here recited, the suggested test is clearly feasible. Moreover, the record does not disclose a long, well-recognized existent need in the art which preceded the Crabtree conception.

Considering now the patents of the counterclaim alleged to be infringed by the plaintiffs:

■ The first in order is that to Curtis, No. 2,033,881 in the same art. Claims 1, 4 and 7 are in issue. The invention is stated to be a pile fabric having the loops of the pile enmeshed in the backing fabric or base and united thereto by a solidified pliable composition, "without detracting from the appearance or 'feel' of the pile threads, which project beyond the surface of the coating composition". It will be sufficient to discuss Claim 7, which reads as follows: "A V-weave warp pile fabric having a backing formed of interlaced ground warps and wefts, V-pile tufts looped over each of said wefts and forming bights on one side and projecting out ends on the opposite side of said backing, said backing being too loosely woven to alone firmly hold said warp pile loops for any usual pile fabric use, and a normally insoluble, flexible, adherent material permeating said ground yarns and securing said warp pile threads to said backing, said bights forming a perceptibly nodulous surface which is not obliterated by said adherent material."

The plaintiffs challenge the validity of this patent and also the claim of infringement. The application for the patent was filed on November 22, 1927, subsequent to that of Crabtree, which was filed on August 10, 1926. Clearly the only difference to be noted between Curtis and Crabtree is the extent to which the coating is intended to penetrate the pile fabric. It is quite clear, as plaintiff's expert witness Grosvenor demonstrated, that the commercial embodiments of the plaintiffs do not fall within the limitations of the Curtis claims in suit. In any event these claims must be held to be invalid in view of Crabtree's prior application. Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651. Moreover, on the general subject of lack of invention, it is sufficient to observe that the prior art which was discussed in considering the Crabtree in-

vention is equally applicable to Curtis and leads to the same result.

■ The next patent of the counterclaim is that to Hiers, No. 2,070,335. The application for this patent was filed October 16, 1935 and relates to a porous coated pile fabric. Only Claim 1 of the patent is in issue. As compared with the other patents in suit the alleged invention here relates to the porosity or ventilating quality of the fabric and the endeavor to retain it, even when the insoluble solidifying composition is applied as a backing to the fabric. The claim reads: "An impregnated ventilated flexible single-plane backing V-pile fabric which consists of interwoven warp and weft backing threads, warp pile V tufts having their tips free of impregnating material looped around a single weft thread so that the tips of the pile bights project below the backing threads, said pile tufts being firmly anchored in the backing fabric by a cementitious binding material, which is thoroughly diffused in and largely confined within said threads and locally to and in said tufts at that portion of the tufts which are in the plane of the backing threads, whereby the interstices between the threads are not filled and the porosity as well as the textile feel is preserved on both sides of the finished fabric."

The photomicrographs of the alleged infringing product, as interpreted by Grosvenor, show that the location of the rubber within the pile V's is confined largely to the impregnation of the bight with but a suspicion of coating to the intermediate weft threads, and that the rubber is on the outside of the weft and not on the inside. In respect to the warp he said that it was coated only to the extent of about one-third of the thickness, but that the rubber had not penetrated into the plane of the warp itself. He compared the rubber in the fabric with the illustration of its location in Fig. 2 of the Hiers patent. In plaintiff's fabric the threads are not impregnated. They are merely coated on one side and the rubber is in the pile bases. Such is not the showing in specification or drawing of the Hiers patent. Grosvenor's conclusions that the plaintiff's fabric shows impregnation of the bights of the pile tufts and outside portions of the ground threads without being diffused or confined within the ground threads, is not overcome by any evidence adduced by the defendants. Moreover, the limitation in the claim that "the textile feel is preserved on both sides

of the finished fabric," would itself defeat the claim of infringement, for the plaintiff's fabric on the reverse side has a distinctly rubbery feel. I conclude, therefore, that the Hiers patent is not infringed.

The next counterclaim patent is to Bird, No. 2,070,251. This patent was issued February 9, 1937, for an impregnated pile fabric and method of making the same, and involves Claims 1, 9, 11 and 12. The specification of this patent recites that the use of long pile, though advantageous in concealing and protecting the backing threads, had been found to be objectionable because of the tendency of such long pile to crush when subjected to atmospheric dampness or crushing. Bird observed, as had Crabtree, that with a short length of pile, the objectionable "grinning through" resulted and also a reduction of the security in anchorage of the pile tufts.

In addition to overcoming these objections, he sought to produce an impregnated cut pile fabric, having a substantial body because of a greater face density per unit of area and structure, and in which the interstices are so located and of such size that the fabric can maintain porosity after impregnation with a binder such as rubber latex to provide adequate pile anchorage. To produce a pile fabric having a continuously uniform face he proposed to weave on the double plush principle, on a loom containing a reed, by drawing through each of the reed dents a plurality of pile warp threads, each having a diameter larger than the maximum diameter of the pile warp threads, which with, so he said, the customary knots therein, could be drawn in practical weaving through reed dents having one-half the width of said reed dents, and associating a plurality of pairs of upper ground warps and a plurality of pairs of lower ground warps, and subsequently impregnating the fabric locally.

It may be said at the outset that the kind and manner of impregnation referred to in the Bird patent are disclosed in the Hiers patent in suit.

■ Of the four claims in issue, Claim 1 relates to the product, and Claims 9, 11 and 12 to the method of weaving. It is charged that the last three named claims are invalid for indistinctness or indefiniteness. The contention has merit, for each of these claims recites the use of "at least two pile warp threads, each having a diameter larger than the maximum diameter of pile warp threads, which with

the customary knots therein would pass in practical weaving through a reed dent, etc." At least that is the language found in Claim 9. In Claims 11 and 12 the language is varied somewhat. These claims provide for the use of "a plurality of pile warp threads, each having a diameter larger than the maximum diameter of pile warp threads which with the customary knots therein, etc."

What is the denotation of the terms "maximum diameter of pile warp", of "customary" knots in the pile warp threads? What is the significance of the term "practical" as an adjective modifying the term "weaving"? The record discloses a great variety in the characteristics of yarn. The witness Giesen referred to woolen or mohair which may be hairy. It may be spun with a hard twist or a soft twist or may be slashed. These characteristics all affect the way in which the yarn passes through a reed. He also disclosed that the art knew a variety of kinds and sizes of knots known as weavers' knots, round knots and mohair knots.

But assuming that the specification was sufficiently clear to one experienced in the art to follow the instructions given, the claims, because of the ambiguous denotation, are uncertain in their scope.

Moreover, the plaintiffs contend that the identical weaving method illustrated by Fig. 7 of the Bird patent has been in large commercial use by the plaintiff Sidney Blumenthal & Co. since 1913, and that such use continues. Fig. 7 is a detail of a portion of the fabric and illustrates a single dent grouping. Samples of cloth made by the plaintiff Blumenthal at the time of manufacture were offered in evidence. As described by Giesen, the method of manufacture was that indicated in the showing of Fig. 7 of the Bird patent as a double draw, i. e. a double unit or two repeats in one dent. In detail the witness described from the records of the order department on a sheet dated November 9, 1916, the number of yards out, the shuttles to be used—2; the gear—108-120. The first gear showed the number of picks that should be in the cloth, and the latter the height of pile expected to be made. The sheet referred to a reed of eleven dents per inch. This sheet likewise specified the width of the cloth in the loom,' which included the salvage, as of fifty-six inches. Accordingly there were 616 dents in the whole reed, and since there were 1200 pile

ends, it followed that there were two pile ends in each dent of the reed. Giesen accounted for the 16 extra ends, explaining that 600 ends are used for the piles and 8 dents on each side for the edges, i. e. the salvage. Other data indicated 4800 ends under the term "ground". That divided by 600 dents to the reed gives 8 ends per dent, which indicated two pile and 8 ground warp ends for passing through a single dent. The evidence in respect to prior use by Sidney Blumenthal & Co. is thus abundantly established under the most rigid rule which requires that a prior use be proved by clear and convincing evidence beyond a reasonable doubt.

For the foregoing reasons Claims 9 and 11 must be held invalid. Claims 1 and 12 in effect merely add such impregnation as was described in the Hiers patent. Therefore, these two claims must likewise be held invalid because of prior art.

There remains for consideration patent No. 2,001,488 to Drobile for an apparatus for coating fabrics.

This patent was issued in 1935 on an application filed March 7, 1930. The improvements are said to relate to the coating of pile fabrics woven with a backing containing a subnormal number of weft threads and having pile looped over each weft thread so loosely enmeshed in the backing as to be unsuitable for use in the condition in which it is woven, and the application to such fabrics of an aqueous dispersion of rubber, solidified on the fabric by heat. The loosely woven pile fabric is coated while suspended from card clothing rollers which support the pile face without displacing the pile from the backing, and the coating is confined and swirled adjacent to the point of application of the backing to penetrate the fabric.

Only Claims 7 and 8 of the patent are in issue. It will be sufficient to quote Claim 7: "In apparatus for impregnating the back of pile fabric, the combination with a reservoir for an impregnating fluid, of a blade to which fluid is supplied from said reservoir, and means for supporting and translating fabric past said blade and comprising spaced card-clothing rollers forming the sole support holding against the thrust of said blade pile fabric suspended between said card-clothing rollers during the spreading of impregnating fluid thereon, said card clothing rollers having teeth housing the pile of fabric being impregnated and supporting the back thereof

without substantial pressure on the face of the pile."

The plaintiffs resist infringement on the ground that their machine, as illustrated in the pre-trial stipulation, discloses that they supply the rubber to a trough which overflows at its upper rear edge to deposit the rubber on the fabric moving under the doctor or spreading blade. In other words, the difference between the Drobile machine and that of the plaintiff is that in the Drobile patent the coating is discharged from an inclined hinge plate, 37, to the blade 38 and is then applied by such blade to the fabric. It is to be noted that both Claims 7 and 8 include as an element "a blade to which fluid is supplied from said reservoir" and means for supporting and "translating" the fabric past said blade, at which time the fabric becomes impregnated.

▮ Generally it may be said that infringement cannot be avoided by a mere change in the succession of the operative parts unless some difference in function or value attaches to the specific structure described in the claim. Such a difference was indicated in the prosecution of the application for the Drobile patent, for when it came before the Board of Appeals in the Patent Office it was said by that Board: "Appellant argues that, in addition to the elements of the patent to Ford, it is necessary to have a spreader and deflector, such as applicant's hinged baffle plate, 37, to which impregnating material is not only discharged from the reservoir, but by which such material is distributed uniformly to the blade. It is argued that the uniform distribution of the impregnating fluid to the blade itself, instead of directly to the fabric, renders it practical to use low viscosity impregnators such as latex. It is further argued that it is necessary, in order to secure uniformity of penetration, that the latex be initially applied to the backing to a uniform depth, and that this can be secured only by an initial, uniform distribution of the material on the blade before it comes in contact with the fabric at all. It is further argued that this uniform distribution of the latex to the blade is conveniently effected by means of feed cocks on the reservoir, containing impregnating fluid, and that the feed cocks discharge directly to a plate in the path of discharge from the cocks and are adjustable relatively to the blade. It is further argued that by this arrangement the ad-

justable plate receives from the feed cocks and spreads the latex uniformly on the blade and does not merely discharge it to the fabric."

The Board of Appeals held that the distinction over the disclosure of the Ford patent, No. 1,490,100, amounted to a patentable improvement. The plaintiffs having followed the old art cannot now be regarded as infringing the Drobile patent.

Accordingly both the complaint and the counterclaim will be dismissed and there will be filed separately simple findings of fact and conclusions of law in conformity with the foregoing opinion.